UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARY J. MAJANO, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 04-201 (RMC) |
| UNITED STATES,[1] | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

Mary T. Majano, a custodial employee at the Smithsonian Institution ("Smithsonian"), alleges that Jeanny Kim, a manager in the Smithsonian Business Ventures unit, assaulted and injured her after Ms. Majano insisted that Ms. Kim show employee identification before entering a Smithsonian building. According to the Complaint, filed initially in D.C. Superior Court, Ms. Kim became angry, shoved Ms. Majano against a wall, shouted obscenities, and repeatedly jerked a lanyard that Ms. Majano wore around her neck, injuring her neck vertebrae. The Complaint alleges three Counts: Count I, Assault; Count II, Battery; and Count III, Intentional Infliction of Emotional Distress.

The United States removed the action to federal court. At the same time, it filed a certification, pursuant to 28 U.S.C. § 2679(d), that Ms. Kim was acting within the scope of her employment at the time of the incident and a motion to substitute the United States as the defendant

---

[1] The United States is substituted for its employee, Jeanny Kim, under 28 U.S.C. § 2679(d)(1).

in the case. *See* Notice of Removal, Compl. and Certification [Dkt. #1]. Because such a substitution would lead to dismissal of the case under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* ("FTCA"), Ms. Majano challenges the certification that Ms. Kim was acting within the scope of her employment.

The Court previously determined on summary judgment that Ms. Kim was acting within the scope of her employment. *See* Mem. Op. [Dkt #40] filed Apr. 11, 2005. Ms. Majano appealed, and the D.C. Circuit remanded for an evidentiary hearing on scope of employment. *Majano v. United States*, 469 F.3d 138, 142 (D.C. Cir. 2006). The Court held the required evidentiary hearing on January 14-16, 2008, during which it was extremely liberal in admitting exhibits and testimony on Ms. Majano's behalf.[2] The two protagonists described very different scenaria regarding the events in question. From the entire record, including specifically the demeanors and attitudes of the two women as witnesses, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT[3]

1.  Mary J. Majano was a custodian employed in the Victor Building by the Smithsonian Institution on June 17, 2003. Tr. I at 10 (Majano).

2.  The Victor Building is an office building owned by the Smithsonian in 2003 but not

---

[2] Citations to testimony at the evidentiary hearing are to the transcript of January 14, 15, or 16, 2008, and are cited as "Tr. I," "Tr. II," or "Tr. III" respectively, with a page number and a parenthetical indicating the name of the witness.

[3] The Court refers the reader to its earlier opinion in this matter, Mem. Op. filed Apr. 11, 2005, and to the opinion of the D.C. Circuit, *Majano*, 469 F.3d 138, for background facts. The evidentiary hearing was focused on whether Ms. Kim was acting within the scope of her employment, and this Opinion will remain so focused.

exclusively inhabited by Smithsonian employees.[4]  It is not on the Mall but is in downtown D.C.

3. Ms. Majano is a native speaker of Spanish, who is an immigrant to this country.  She does not speak or understand much English.  Two interpreters were employed at the hearing for the purpose of interpreting Ms. Majano's testimony and to interpret English-language testimony for her.

4. To enter the Victor Building, employees had to use an access card, variously called a Kastle Card, a Key Card, or a proximity card.  Tr. I at 60 (Majano); Tr. II at 101-02 (Kim).  It was a plain white card.  Tr. II at 101-02 (Kim). All of the custodial employees at the Victor Building, including Ms. Majano were given strict instructions on security.  Those instructions included a prohibition on "piggybacking," *i.e.*, "when an authorized employee uses the card access or an access card to gain access to a section of the building, and somebody else tries to come in using their — that person's access card to get past the door."  Tr. II at 73 (Carew).

5. Willie Jones, assistant security manager at the Victor Building, indicated that piggybacking was a violation of security procedures.  Tr. I at 83 (Jones).  Similarly, Daniel Davies, facilities manager at the Victor Building, indicated that he heavily emphasized the need to comply with security procedures.  Tr. II at 39 (Davies).  Via email, Mr. Davies directed managers at each unit to prohibit piggybacking.  Tr. II at 42, 44-45 (Davies).

6. Despite the fact that piggybacking violated security procedures, Tr. II at 73-74 (Carew), Hugh Carew, a Smithsonian security services division investigator, also admitted that security training of the staff at the Victor Building was "uneven from unit to unit." Tr. II at

---

[4] There was a steakhouse and a coffee shop in the building.  Tr. II at 40 (Davies).

85 (Carew).

7. Because of her security training, Ms. Majano would not allow piggybacking even if she knew the person attempting to enter the Victor Building behind her. "They can't come in if they don't have their *key*. They can't come in." Tr. I at 60 (Majano) (emphasis added).

8. Kastle Key Cards were not the same as Smithsonian identification or "ID" cards. The plain white Key Cards unlocked secure doors. In contrast, Smithsonian ID cards were blue and bore a photo of the ID holder. Tr. II at 102-03 (Kim).

9. Sometimes witnesses used the word "ID" to mean Kastle Card.[5] When witnesses used the term "ID" card, it was not always clear whether the witness meant the blue photo ID or the white Kastle Key Card. Also, it was not clear whether the anti-piggybacking policy required employees to ask to see a Kastle Card, an ID card, or both.

10. Ms. Majano testified, "We had meetings every month. And we were not allowed to let people enter who we did not know and who did not have *ID*." Tr. I at 60 (Majano) (emphasis added). It is not clear whether she meant Kastle Card, ID card, or both. Similarly, Mr. Carew testified that some – but not all – staff were instructed to confront people trying to enter the Victor Building without their "IDs." Tr. II at 85 (Carew). It is not clear whether he meant Kastle Card, ID card, or both.

11. Custodial employees understood that they would be fired if they permitted someone else to piggyback. John Newton, Ms. Majano's co-worker in building services at the Victor Building, testified "we were told not to let anyone in with our *ID* because they had a problem

---

[5] The reverse was not true. Witnesses did not say Kastle or Key Card if they meant the blue photo ID.

with stuff being missing in the building. And like what they would do is go to the computer and whoever [sic] ID would show up, they would go to that person and that person would be fired." Tr. II at 21 (Newton) (emphasis added). *See also* Tr. II at 24 (Q. You testified that you were told not to let anyone else in on account of being fired? A. Right.) (Newton). Although Mr. Newton used the term "ID," he undoubtedly meant Kastle Key Card as that is the card that would allow an employee to enter the building and that would reveal his entrance on a computer log.

12. Mr. Davies indicated that he could expect arguments to break out about piggybacking. "Q. And so they would be expected to confront somebody who was trying to come in, and say please show me your ID or something to that effect? A. Yeah, at least at that level. Q. And is this the situation in which you would expect arguments to break out? A. Could." Tr. II at 45 (Davies).

13. Mr. Carew also indicated that it was possible for arguments to arise "about showing IDs among people showing up for work." Tr. II at 85-86 (Carew).

14. On June 17, 2003, Ms. Majano arrived for her work shift and entered the Victor Building from a secured door on the P-1 level of the parking garage. She heard Ms. Jeanny Kim behind her. Tr. I at 11 (Majano).

15. Then, either Ms. Majano turned around and partially reopened the door, Tr. I at 11-12 (Majano), or Ms. Kim stuck her foot and then her entire body into the doorway to stop the door from closing. Tr. II at 112 (Kim). The women did not know one another. Tr. I at 50 (Majano); Tr. II at 117 (Kim). "I didn't know who she was, I had never seen her before." Tr. II at 143 (Kim).

16. As she was trained, Ms. Majano immediately demanded that Ms. Kim show her identification, saying "your ID?" Tr. I at 12-13 (Majano); Tr. II at 112 (Kim). Ms. Kim, who was carrying a briefcase in one hand, a purse over her shoulder, file folders under her arm, and a wallet in her hand, held up her blue Smithsonian ID, which showed through the clear plastic side of the wallet.[6] Tr. II at 108 (Kim).

17. Ms. Majano knew that the general public was permitted access to the parking garage and the Victor Building upon display of a photo identification. Tr. I at 66 (Majano). However, the secured door that they both had entered was for Smithsonian employees only.

18. Ms. Kim was not trained regarding security in the same way as Ms. Majano. She believed that only a photo identification, not a Kastle Card, was sufficient for access to the building because it was open to the public. She testified:

> A. Well, everybody had access to the Victor [B]uilding. If you are a member of the public, you would just come through, and you didn't have a Kastle [C]ard, then you would go through the main entrance, show a photo ID, and then you would have access to the building, or inside the building. Q. As you understood the security rules at the Victor [B]uilding, what did they require for visitors who would come to visit you while you were working? A. I believe it was just a photo ID.

Tr. II at 104-04 (Kim); *see also* Tr. II at 108 (Kim).

19. Security was lax at the Victor Building. Ms. Kim journeyed between and among

---

[6] Ms. Majano testified that Ms. Kim carried a purse, Tr. I at 22 (Majano) and a thin folder, and she carried them for the duration of the incident at issue here. *Id*. at 55. Ms. Kim testified that in addition to her purse and folders, she carried a briefcase and her wallet. Tr. II at 108 (Kim). She stated that she carried these items throughout the course of her interaction with Ms. Majano. Tr. II at 117 (Kim).

Smithsonian buildings often and frequently was not required to show ID; security would wave her through. Tr. II at 107 (Kim).

20. Ms. Kim was confused, impatient, and annoyed with Ms. Majano, because she already had shown Ms. Majano her Smithsonian identification but Ms. Majano continued to demand her "ID." Tr. II at 113, 115, 118, 156 (Kim).

21. Either Ms. Kim pushed the secured door open forcefully, causing Ms. Majano to be slammed against the wall, Tr. I at 23, 29 (Majano), or Ms. Kim hurriedly walked past Ms. Majano and the women's shoulders collided with a "jolt." Tr. II at 113 & 160 (Kim). Based on the testimony of these witnesses, the Court concludes the former is what happened.

22. Ms. Kim thus entered the building. Having pushed past Ms. Majano, Ms. Kim continued down the hall and around the corner to the elevator lobby. Who led the way is not important but the Court notes that Ms. Majano exhibited confusion on the point. On one hand she stated that Ms. Kim followed her down the hall. *See* Tr. I at 30 ("I went to punch in and she was following me") & 53 ("she was coming behind me") (Majano). On the other hand, she stated, "I'm sorry. I'm confused right now. When she pushed me against the wall she went ahead, but I was ahead of her. She went on but - - she went in, but I was ahead of her." Tr. I at 53 (Majano).

23. Since Ms. Majano was pushed against the wall, it is only logical (but not critical) to conclude that Ms. Kim proceeded past Ms. Majano down the corridor. After she gained entrance, Ms. Kim kept moving forward, around, and past Ms. Majano. Tr. II at 113 & 156 (Kim), muttering profanities and calling Ms. Majano "stupid" all the way. Tr. I at 30-31 (Majano).

24. Ms. Kim was headed for the elevator in order to go up to her office on 7th floor. Ms. Majano

proceeded toward the elevator to go down to P-3 to punch in.  Tr. I at 30 (Majano).

25. The distance from the inside of the secure door adjacent to the parking garage to the middle of the elevator lobby is forty feet.  Tr. II. at 59 (Dolgos).

26. The women reached the elevator lobby, and one of them pushed the button to call the elevator.

27. Ms. Majano wore her Smithsonian ID together with her Kastle Card and some keys on a lanyard around her neck.  Tr. I at 13 (Majano). She thrust her cards and keys forward toward Ms. Kim and continued to demand "ID," all the time meaning that she wanted to see Ms. Kim's Kastle Card.  Tr. I at 56-57 (Majano).  Both witnesses agreed that Ms. Majano did not request a "Kastle Card" or "proximity card;" she only asked for "ID."   Tr. I at 60 (Majano); Tr. II at 115 & 117 (Kim).

28. Insisting that she had already displayed her identification, Ms. Kim demanded to see Ms. Majano's identification.  Tr. II at 115 (Kim).  When Ms. Majano did not show it, Ms. Kim seized Ms. Majano's cards in order to see Ms. Majano's identification.  Tr. I at 30-31 (Majano).  Ms. Majano pulled away, trying to retreat; Ms. Kim grabbed the cards on the lanyard and pulled them towards her to read the ID.  Accordingly, the lanyard was jerked and Ms. Majano's Kastle Card was bent or broken.  Tr. I at 31-32, 58-59 (Majano).

29. The door of an empty elevator opened, and Ms. Kim let go of Ms. Majano's cards.  Both women entered the elevator and proceeded up to the 7th floor. Neither woman spoke on the elevator.  Tr. I at 32-33 (Majano); Tr. II at 116 (Kim).

30. Ms. Majano's testimony suffered from exaggeration.  She wept copiously concerning an event that happened years ago and that was not inherently emotional.  The Court recognizes

the difference of cultures but even a cultural divide cannot give credence to Ms. Majano's testimony that Ms. Kim yanked her lanyard time and again for five minutes. *See, e.g.*, Tr. I at 54 ("[Ms. Kim] grabbed the lanyard here. That's approximately five minutes she was doing this."); *see also* Tr. I at 30-31, 33, & 56. Even counsel for Ms. Majano indicated that the incident could not have taken five minutes. Tr. III at 36 (COURT: But I do discount Ms. Majano's testimony that it lasted five minutes. MR. GRAY: Right. And frankly, so do I, but I think that . . . when you're in a stressful situation like that . . . you really don't necessarily have a sense of time."). Ms. Kim testified that the interaction lasted between one and three minutes. Tr. II at 116, 165-66 (Kim). The Court finds hers a more believable timeframe from entrance door off the parking garage, forty feet down the hall to the elevator lobby.

31. The incident was also not as violent as Ms. Majano would like to portray. It could not have been, otherwise why would she get on an empty elevator with her alleged attacker? She provided no explanation for this strange behavior.

32. Neither was the incident as tame as Ms. Kim would like to portray; she was definitely angry and rude to Ms. Majano. Ms. Kim, a senior manager in the Smithsonian Business Unit, undoubtedly felt superior to Ms. Majano. She assuredly jerked Ms. Majano's lanyard very hard, at least once, leaving red marks on Ms. Majano's neck and visibly upsetting her. She said no word and made no apology as they rode up in the elevator.

33. Witnesses who saw Ms. Majano's neck that day saw red marks measuring approximately 1/4 inch wide and two inches long. Tr. I at 75 (Thomas); Tr. I at 79, 85-86 (Jones); *see also* Tr. II at 14 ("her neck was a reddish color") (Blanding); Tr. II at 55 (the day after the incident, Ms. Majano showed assistant facilities manager Kalman Dolgos red marks on her neck)

(Dolgos); Tr. II at 7 (the day after the incident, Lieutenant McKinney, a security employee, noticed "some scratches" on Ms. Majano's neck) (McKinney).

34. Ms. Majano dramatically indicated that Ms. Kim hurt her shoulder, Tr. I at 36 (Majano), and that this incident somehow required her to have surgery on both of her arms. Tr. at 43 (Majano). She pulled up her sleeves to show the Court scars on her arms. *Id*. While the scars were real, her testimony was not credible, as Ms. Majano has alleged only a neck injury. She never attributed any kind of shoulder or arm injury to Ms. Kim's actions, and her testimony revealed no conduct that would have led to such injuries. Some months after this incident, Ms. Majano required surgery on her neck, which may (or not) have had its origin in this incident. The causal evidence was too indeterminate to make a finding.

35. A confrontation between employees entering secured doors at the Victor Building was entirely foreseeable because the Smithsonian provided different security training and information to employees in the different units at the Building, and such employees -- divided by language, education, and culture – were bound to encounter each other at secured doorways and be unable to communicate clearly.

36. It was not clear whether employees were supposed to request a Smithsonian ID, a Kastle Card, or both to prevent piggybacking. Further confusion and misunderstanding was engendered because sometimes employees used the term "ID" when they meant to say "Kastle Card."

37. The Court concludes that Ms. Kim acted within the scope of employment during her encounter with Ms. Majano. Ms. Kim was going to work when she entered the Victor Building and was confronted by Ms. Majano demanding identification. The initial incident

at the door simply continued uninterrupted forty feet down the hallway and into the elevator lobby, with Ms. Kim using profanities and Ms. Majano demanding her "ID."

38. Ms. Kim was still headed toward her 7th floor office when she walked down the hallway and approached the elevator. At that point, Ms. Majano thrust her cards at Ms. Kim to demand "ID" and Ms. Kim grabbed the cards in an attempt to learn who Ms. Majano was. Ms. Kim did not understand why Ms. Majano kept asking for identification when she already had shown it. Although Ms. Majano kept repeating her demand, "your ID," Ms. Majano meant to indicate that she wanted Ms. Kim to produce a Kastle Card. Their confrontation was entirely predictable.

## II. CONCLUSIONS OF LAW

Because the United States Attorney (as designee of the Attorney General) has certified that Ms. Kim was acting within the scope of her employment, Ms. Majano bears the burden of proving otherwise. *See Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006). The Court makes this determination. *See Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1984); *accord Rasul v. Myers*, 512 F.3d 644, 659 n.8 (D.C. Cir. 2008).

The scope of employment of a federal employee is governed by the law of the place where the employment relationship exists. *Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006); *Haddon v. United States*, 68 F.3d 1420, 1423 (D.C. Cir. 1995). Thus, because Ms. Kim was employed by the Smithsonian in Washington, D.C., District of Columbia law applies.

To determine whether an employee was acting within the scope of employment, the District of Columbia looks to the Restatement (Second) of Agency, which provides:

> Conduct of a servant is within the scope of employment if, but only

>   if:
>
>   >   (a) it is of the kind he is employed to perform;
>   >
>   >   (b) it occurs substantially within the authorized time and space limits;
>   >
>   >   (c) it is actuated, at least in part, by a purpose to serve the master; and
>   >
>   >   (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228(1). "Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id*. § 228(2)); *accord Rasul*, 512 F.3d at 655.

Under the first prong of the Restatement test, to qualify as conduct "of the kind the individual was employed to perform" the employee's actions must have been either of the same nature as that authorized by the employer or "incidental to the conduct authorized." *Haddon*, 68 F.3d at 1424 (quoting Restatement (Second) of Agency § 229(1)). In *Haddon*, the Circuit held that whether conduct is "incidental" depends on whether the conduct is a "direct outgrowth" of an employment assignment:

>   According to the D.C. Court of Appeals, conduct is "incidental" to an employee's legitimate duties if it is "foreseeable." "Foreseeable" in this context does not carry the same meaning as it does in negligence cases; rather, it requires the court to determine whether it is fair to charge employers with responsibility for the intentional torts of their employees. To be foreseeable, the torts must be a direct outgrowth of the employee's instructions or job assignment.

*Haddon*, 68 F.3d at 1424 (internal quotations and citations omitted). In *Council on Am. Islamic Relations*, 444 F.3d at 662, the Circuit explained that whether conduct is incidental depends "on the

underlying dispute or controversy, not on the nature of the tort." *Id*. at 664 (internal quotation omitted). The proper inquiry is "broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf." *Id*.; *see also Johnson v. Weinberg*, 434 A.2d 404, 408 (D.C. 1981) (where the alleged tort is the outgrowth of a job-related controversy, then the employer remains liable, since the master and servant relationship is not broken).

The case at hand is analogous to *Caesar v. United States*, 258 F. Supp. 2d 1 (D.D.C. 2003), where the plaintiff sued a coworker after a verbal argument regarding a work project that escalated into a physical confrontation. "[F]ollowing their verbal exchange, Ms. Robinson slammed her office door into Ms. Caesar using her full body weight, hitting Ms. Caesar in the back of her right shoulder . . . ." *Id.* at 2. After Ms. Caesar brought suit, the United States Attorney certified that Ms. Robinson was acting within the scope of her employment at the time of the dispute. *Id*. The court found that because the alleged tortious conduct "occurred during or immediately following a dispute regarding how a particular project Ms. Robinson was working on was being handled, it is clear that it was triggered by a dispute over the conduct of the employer's business and arose naturally and immediately between [Ms. Robinson] and plaintiff . . . in connection with [her] job." *Id.* at 4 (quotation marks and citations omitted). *Accord Rasul*, 512 F.3d at 658-69 (acts of torture allegedly committed by military personnel against detainees at Guantanamo Bay, Cuba, were within the scope of employment because the conduct was incidental to authorized conduct — the torture was intended as an interrogation technique); *see also Harbury v. Hayden*, No. 06-5282, at *16 (D.C. Cir. Apr. 15, 2008) (CIA agents acted within the scope of their employment when they hired and managed informants, conducted covert operations, gathered intelligence, and worked with individuals who physically abused and killed Ms. Harbury's husband, as their actions were foreseeable and a direct

outgrowth of their intelligence activities).

In *Rasul*, the court "rested its scope-of-employment analysis on several D.C. Cases holding that seriously criminal and violent conduct can still fall within the scope of a defendant's employment under D.C. law — including sexual harassment, a shooting, armed assault, and rape." *Harbury*, No. 06-5282, at *15-16 (citing *Howard Univ. v. Best*, 484 A.2d 958, 987 (D.C. 1984) (university dean acted within the scope of his employment when he sexually harassed a faculty member during meetings); *Johnson*, 434 A.2d at 409 (laundromat employee acted within the scope of his employment when he shot a customer; the assault arose out of the transaction which initially brought the customer to the premises (to launder shirts) and was triggered by a dispute over the conduct of the employer's business (missing shirts)); *Lyon v. Carey*, 533 F.2d 649, 652 (D.C. Cir. 1976) (finding that the assault and rape of plaintiff by a mattress deliveryman was within the scope of employment because it "arose naturally and immediately" between the deliveryman and the plaintiff regarding the plaintiff's request to inspect the mattress before payment and the deliveryman's insistence on cash rather than a check — the customer testified that the deliveryman had said, "if I did not give him cash money he was going to take it on my ass."))._[7]_

The cases emphasized by Ms. Majano are distinguishable. In *Haddon*, an electrician at the White House approached a White House chef and threatened to follow him home and beat him unless the chef withdrew an equal employment opportunity claim the chef had lodged against a third person. *Haddon*, 68 F.3d at 1422. The D.C. Circuit found that the alleged tort was unrelated to the electrician's official duties and was outside the scope of his employment. *Id.* at 1426. The tort "did

---

[7] "Many states and D.C. apply the scope-of-employment test very expansively, in part because doing so usually allows an injured tort plaintiff a chance to recover from a deep-pocket employer rather than a judgment-proof employee." *Harbury*, No. 06-5282, at *16 n.4.

not arise directly out of his instructions or job assignment as a White House electrician." *Id*. at 1425. Similarly, in *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C. 1979), the D.C. Court of Appeals found that a railroad employee was not acting within the scope of his employment when he kicked a taxicab driver. The railroad employee had worked a shift on a train that started in Virginia and finished in New Jersey. *Id*. at 28. After completing the shift, the employee traveled by train to Union Station in Washington, D.C. There, he sought a cab to take him back to Potomac Yard in Virginia. The taxi driver wanted to use the rest room first and the employee did not want to wait, so the employee assaulted the taxi driver. *Id*. at 29. The court found that the employee's actions were not an outgrowth of his job instructions or job assignment nor an integral part of the employer's business, that of running a railroad. *Id*. at 33.

In *Haddon* and *Penn Central*, the employees' actions were not "incidental" to conduct authorized by their employer — that is, their actions were not a "direct outgrowth" of their official duties and the courts determined that it was not fair to charge their employers with responsibility for the intentional torts of the employees. *See Haddon*, 68 F.3d at 1424. In *Haddon*, the electrician threatened a chef with harm if he did not withdraw an EEO claim against a third person, actions and a dispute wholly unrelated to the electrician's job. In *Penn Central*, the employee was not even within the time and place of his employment since he had completed his shift and had left the work site.

Here, it is undisputed that Ms. Kim was entering the Victor Building to perform work on behalf of the Smithsonian, which she needed to access by way of the elevator. Ms. Majano was also arriving for work. The women did not know one another, and they did not discuss anything other than Ms. Kim's desire to enter the building and Ms. Majano's desire to see Ms. Kim's

identification. There is no allegation of any personal animosity or motive in this case. Their confrontation was a result of: (1) Ms. Majano's belief that she would be fired if she permitted anyone to "piggyback;" (2) Ms. Kim's belief that access to the Victor Building was permitted upon display of a photo identification; (3) Ms. Kim's belief that Ms. Majano was unjustly impeding Ms. Kim's entry when Ms. Kim had already shown her identification; and (4) Ms. Majano's repeated demands for "ID" when she meant to demand to see Ms. Kim's Kastle Key Card. These conflicting understandings of security rules and what, exactly, Ms. Majano wanted to see -- compounded with Ms. Kim's impatience – led to the confrontation between the women.

The Court of Appeals wondered if Ms. Kim's actions went from scope of employment at the doorway to personal animosity in the elevator lobby, 40 feet away. *Majano*, 469 F.3d at 142. This Court concludes not. The entire incident, from beginning to end, lasted no more than three minutes and possibly less. It was a single fluid encounter: Ms. Kim pushed her way in; the two women walked down the hallway, each talking to the other but neither fully understanding; they reached the elevator lobby and Ms. Majano one more time demanded Ms. Kim's ID, causing Ms. Kim to demand to see Ms. Majano's ID and then to grab at it and jerk it. There was no break in Ms. Majano's demands to see "ID" and no break in Ms. Kim's hurried impatience with those demands.

Such a confrontation was foreseeable and should have been "expectable" by a reasonable employer. The Smithsonian provided different security training and information to its employees and stressed security concerns differently. Employees with differing languages, education levels, and cultures could be expected to encounter each other at secured doorways. Mr. Davies and Mr. Carew both testified that arguments could break out at the secured doorways when one employee

tried to prevent another from piggybacking. Whether it was really fair for the Smithsonian to require custodial employees without English-language skills to enforce the anti-piggybacking policy is not the question. Clearly Ms. Majano was doing what she had been told, even if her English were poor and her demands unclear. Just as clearly, Ms. Kim's transit to her office was a necessary everyday occurrence. The contretemps between them was a direct outgrowth of their jobs and thus was within the scope of employment of each of them.

The dispute over whether Ms. Kim would be permitted entry into the Victor Building and into the elevator arose naturally and immediately from these circumstances. During the confrontation with Ms. Majano, Ms. Kim acted, at least in part, with a purpose to serve Smithsonian — that is, to proceed to her office in order to conduct Smithsonian business. The conduct of Ms. Kim, while not pleasant, was of the kind she was employed to perform, *i.e.*, entering the building to go to work and checking the ID of a custodial employee of whom she wanted to complain. The incident occurred within authorized time and space limits and it cannot be said that this use of force, with its unintended consequences to Ms. Majano, could be unexpectable under the circumstances. Thus, Ms. Kim's actions as she entered the building and while she proceeded to the elevator to go to her office were within the scope of her employment.

The Federal Employees Liability Reform and Tort Compensation Act of 1988 ("FELRTCA") confers immunity on federal officials by making a claim under the FTCA against the United States the exclusive remedy for torts committed by U.S. employees in the scope of their employment. *United States v. Smith*, 499 U.S. 160, 163 (1991); *see* 28 U.S.C. § 2679(b)(1) ("The remedy against the United States provided by sections 1346(b) and 2672 of this title . . . arising or resulting from the negligent or wrongful act or omission of any employee of the Government while

acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages . . . ."). Because Ms. Kim acted within the scope of her employment, Ms. Majano's exclusive remedy lies under the FTCA.

Although the FTCA waives sovereign immunity for many tort claims, the United States retains immunity from specified actions. As relevant here, no claim may be brought against the United States that arises out of an assault and battery unless the tort was committed by a federal investigative or law enforcement officer. 28 U.S.C. § 2680(h). Because Ms. Kim is not an investigative or law enforcement officer, the FTCA excludes Count One (assault) and Count Two (battery) of the Complaint.

Count Three, alleging intentional infliction of emotional distress, is not explicitly excluded from the FTCA. However, the FTCA also excludes "any claim arising out of" any of the enumerated torts. 28 U.S.C. § 2680(h). Count Three alleges that "Plaintiff was tremendously frightened and made hysterical by the Defendant's actions, and . . . the Defendant intentionally caused Plaintiff severe emotional distress." Compl. ¶¶ 20-21. As the "actions" referenced are the basis for Ms. Majano's assault and battery claims, Count Three must be excluded as "arising out of" a tort specifically excluded under 28 U.S.C. § 2680(h). *See Koch v. United States*, 209 F. Supp. 2d 89, 94-5 (D.D.C. 2002), *aff'd*, No. 02-52222, 2002 WL 31926832 (D.C. Cir. Dec. 31, 2002) (finding that a claim for intentional infliction of emotional distress was excluded).[8] In sum, Ms. Majano's Complaint is barred by the FELRTCA and by the FTCA and must be dismissed.

---

[8] Although Ms. Majano is barred from pursuing a civil suit against both Ms. Kim and the United States, it may be possible for her to recover for her injuries under the Federal Employee Compensation Act ("FECA"), 5 U.S.C. § 8102, which permits federal employees to receive compensation for injuries sustained while in the performance of their duty.

## III.  CONCLUSION

For the foregoing reasons, this case will be dismissed.  A memorializing order accompanies this Memorandum Opinion.


Date: April 23, 2008                             _____/s/_____
                                                                ROSEMARY M. COLLYER
                                                                United States District Judge